TEDCO DEVELOPMENT CORP., APPELLEE AND CROSS-APPELLANT, V. OVERLAND HILLS, INC., A NEBRASKA CORPORATION, ET AL., APPELLANTS AND CROSS-APPELLEES.

265 N. W. 2d 56

Filed May 3, 1978. No. 41546.

James C. Cripe, and Timothy J. McReynolds of Gross, Welch, Vinardi, Kauffman & Day, for appellants.

Walsh, Walentine & Miles, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, BRODKEY, and WHITE, JJ., and KUNS, Retired District Judge.

WHITE, C. J.

On March 22, 1977, plaintiff Tedco Development Corp. (hereinafter referred to as Tedco) filed a petition against the defendants Overland Hills, Inc. (hereinafter referred to as Overland Hills), and Harold R. Young, Jr. (hereinafter referred to as

Young), seeking specific performance of a purchase agreement for the sale of an 180-acre tract of land situated in Sarpy County, Nebraska. Young was named as a defendant in Tedco's action because he claimed an interest in the real estate in question via a previous purchase agreement he had with the defendant Overland Hills, and had filed an action against Overland Hills for specific performance of his purchase agreement, which was for the identical tract of land. Young and Tedco's actions were consolidated and the case tried to the District Court.

The District Court held that Tedco was entitled to specific performance of its purchase agreement. Young's petition was dismissed. Young and Overland Hills filed motions for a new trial or, in the alternative, for a judgment notwithstanding the verdict which were overruled. Both appeal. We affirm the judgment of the District Court.

Being equitable in character, this action is triable de novo subject, however, to the condition that when evidence on material questions of fact is in irreconcilable conflict this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite. Marfisi v. Spagnola, 197 Neb. 211, 248 N. W. 2d 24 (1976); Kolc v. Krystyniak, 196 Neb. 16, 241 N. W. 2d 348 (1976).

The basic facts are not in dispute. On October 19, 1976, Odell and Eva Lopp entered into a purchase agreement for the land in question with Overland Hills. This agreement provided for a purchase price of $450,000, which included a $10,000 earnest deposit held in escrow. On February 1, 1977, the Lopps assigned this purchase agreement to Young. On February 4, 1977, Young and Overland Hills entered into an agreement which acknowledged the assignment. The closing date was rescheduled for February 25, 1977. The agreement contained the fol-

lowing provision: "If for any reason the Seller is unable to tender marketable title to real estate as described * * * at the time designated for closing, then the Purchaser is relieved of its obligation to tender the purchase price and shall be entitled to either elect to have his Ten Thousand Dollars ($10,000.00) deposit returned * * * or request specific enforcement of the Uniform Purchase Agreement and this amendment."

On February 14, 1977, Tedco and Overland Hills entered into a purchase agreement for the identical tract of land. This agreement called for a purchase price of $485,000 and provided: "It is understood and agreed by and between buyer and seller that there is presently existing an outstanding purchase agreement wherein the seller has agreed to sell to third parties pursuant to the terms and conditions of the purchase agreement and amendment thereof existing between them. It is agreed, however, that in the event the third parties fail to close said transaction per the terms and conditions of their agreement with seller on or before February 25, 1977, that buyer hereunder shall have the sole and only outstanding purchase agreement legally binding upon the seller."

Representatives of Young and Overland Hills met on February 25, 1977, for the purpose of closing their agreement. It is undisputed that on this date the agreement was not closed.

On March 2, 1977, Overland Hills sent a letter to the escrow agent demanding that the $10,000 earnest money of the Young contract be forfeited for failure to close in accordance with the terms of the Young contract. Upon learning that the Young contract had not been closed, Tedco demanded that its contract be closed. On April 6, 1977, Overland Hills sent a letter to Tedco returning its $10,000 earnest money and stating that the Tedco contract, which had been recorded sometime prior to February 25, 1977, was

the only impediment to the closing of the Young contract.

Both Young and Tedco requested specific performance. The specific performance of a contract by a court of equity is not generally demandable or awarded as a matter of absolute legal right but is directed to and governed by the sound legal discretion of the court, dependent upon the facts and circumstances of each particular case. It will not be granted where enforcement would be unjust and may be denied where the party seeking it has failed to perform. O'Brien v. Fricke, 148 Neb. 369, 27 N. W. 2d 403 (1947); Wineberg v. Baker, 123 Neb. 411, 243 N. W. 122 (1932); Russell v. Western Nebraska Rest Home, Inc., 180 Neb. 728, 144 N. W. 2d 728 (1966). The burden is primarily on the party seeking specific performance to show his right in equity and good conscience to the relief sought. Russo v. Williams, 160 Neb. 564, 71 N. W. 2d 131 (1955). The evidence which entitles a party to specific performance must be clear, satisfactory, and unequivocal. Meyer v. Meyer, 180 Neb. 379, 142 N. W. 2d 922 (1966).

We shall first look at Young's purchase agreement. It provided that the balance of $440,000 was to be paid either by cash or by certified check at the time of delivery of the deed. The seller was to have good, valid, and marketable title, in fee simple, and to give the purchaser a warranty deed. The closing date was February 25, 1977. If the purchaser was unable to tender the purchase price at the time designated for closing the seller was entitled to receive the earnest deposit.

The record shows that on February 25, 1977, and for some time thereafter, vendor Overland Hills did not have marketable title to the subject real estate. Marketable title is defined as a title a man of reasonable prudence, familiar with the facts and questions of law involved, would accept as a title which could be sold to a reasonable purchaser. Podewitz

v. Gering Nat. Bank, 171 Neb. 380, 106 N. W. 2d 497 (1960). "Marketable title means title free from reasonable doubt both as to matters of law and matters of fact * * *." Robinson v. Bressler, 122 Neb. 461, 240 N. W. 564 (1932). A title search conducted by Fidelity National Title Insurance Company listed eight specific requirements which needed to be met before title insurance would be issued. The most significant of these irregularities involved a transaction in which Donald Graham, treasurer of Overland Hills, obtained deeds to Lots 1, 2, and 3 of the Overland Hills subdivision in consideration for Graham's payment to Commercial Federal Savings and Loan Association for the release of a mortgage on the lots. The release price for the lots should have been approximately $100,000, but Graham obtained a release for $9,000, by camouflaging his request for a release of the mortgage on these lots with a group of releases for other lots. As of February 25, 1977, the land had not yet been conveyed back to the corporation.

On February 25, 1977, Young's attorney brought with him two uncertified checks, both drawn upon the account of Nebraska Homestead Trade, Inc. (of which Young, his wife, and sister are the sole shareholders), at the First Westside Bank. One check was drawn in the amount of $80,000 and the other was blank, intended to cover the remaining purchase price. Young testified that there was slightly over $80,000 in this account, $40,000 had come from Kenneth Stahl and Ray Lemke, $20,000 apiece, $20,000 had come from Ted Caniglia, and $20,000 from Young from savings and by borrowing. Young stated that his attorney was to fill in the blank check in the amount of $370,000, the balance of the purchase price. He admitted that as of February 25, 1977, there were no funds in the account to cover the second check.

Kenneth Stahl testified that a day or so before the

scheduled closing he met with Lemke, Young, and Caniglia at Young's house. Young needed financing for the purchase. An agreement was reached whereby Stahl was to put up $170,000 ($20,000 of which was in Young's Nebraska Homestead account) toward the purchase and Lemke was to contribute $70,000 ($20,000 of which was in Young's Nebraska Homestead account). Ted Caniglia testified that he and Young agreed they would take approximately 75 to 80 acres and that the remaining 95 to 100 acres would be divided between Stahl and Lemke. He and Young would obtain a loan for their portion.

Eugene Tschida, president of the Bank of Papillion, testified that he did business with both Stahl and Lemke and that Stahl's line of credit was about $150,000, and that if Stahl had appeared on February 25, 1977, he would have been willing to give him a cashier's check for that amount. He stated that Lemke would have had $70,000 available to him on that date. He admitted, however, that neither Stahl nor Lemke had actually ever requested this money.

Introduced into evidence was a loan commitment from the Ames Bank in Omaha to Caniglia Builders in the amount of $150,000. This document states that the loan is subject to the following conditions: (1) Personal signatures of Young, Caniglia, and one Prentice Beebee, and their wives; (2) a first mortgage lien upon the property; (3) a survey satisfactory to the bank of the area to be mortgaged; and (4) a land development loan through the Ames Bank within 90 days. The loan commitment and its conditions were accepted on February 28, 1977, by Young and Caniglia. There is no indication in the record that Prentice Beebee accepted the conditions. Young stated that as of February 25, 1977, no survey, as referred to in the loan commitment, was available. Over objections by counsel for Tedco, Caniglia testified that the loan commitment was definitely available to them as of February 24, 1977.

Charles Clatterbuck, a real estate developer, testified that on February 24, 1977, around 2 p.m., Young and Caniglia approached him concerning the Overland Hills property. They stated they needed an investment of about $350,000 and that this money was needed by the following day when the contract was scheduled to close.

John Patrick "Pat" Kelly, Overland Hills' attorney, testified that he did not see any money on the scheduled closing date. John Fullenkamp, Tedco's attorney, testified that Kelly told him subsequent to February 25, 1977, that Young did not have the funds to close. Exhibit 21 is a letter dated March 2, 1977, from Overland Hills, drafted by Kelly and signed by Donald Graham, to Fidelity National Title Insurance Company demanding payment of Young's earnest money since the Young contract was not closed "pursuant to the terms of the amended contract."

In 71 Am. Jur. 2d, Specific Performance, § 60, p. 88, it is stated: "The failure or inability or refusal to carry out the terms of the contract *at the time when performance is due* will ordinarily be grounds for refusing specific performance, since specific performance will not generally be decreed in favor of a party who has himself been in default, * * *." (Emphasis supplied.)

When was performance due under Young's contract? The contract provided for a closing date of February 25, 1977. In 71 Am. Jur. 2d, Specific Performance, § 63, p. 91, it is stated: " * * * in the ordinary cases of sales of realty, the general object being to make a sale for an agreed sum, the time of payment is regarded in equity as formal, and as meaning only that the purchase shall be completed *within a reasonable time,* and substantially according to the contract, *regard being had to all the circumstances.*" (Emphasis supplied.)

In Dodge v. Galusha, 151 Neb. 753, 39 N. W. 2d 539 (1949), we held: " 'In the ordinary contract for the

sale of land, equity does not regard time as of the essence, though it may be made such where so expressly stipulated or an intention that it shall be such is clearly manifested by the agreement as a whole, *construed in the light of the surrounding circumstances.'* '' (Emphasis supplied.) See, also, Willard v. Foster, 24 Neb. 205, 38 N. W. 786 (1888).

We conclude, in light of all the circumstances, particularly the existence of the Tedco purchase agreement, which was known to all the relevant parties no later than February 25, 1977, that Young's purchase agreement was required to close on February 25, 1977, or within a reasonable time thereafter.

We find that on February 25, 1977, and for a reasonable time thereafter, Young was not in a position to tender the purchase price under the contract. The record reveals frenzied activity on the part of Young to assemble the necessary funds to enable him to make the purchase. Numerous individuals and institutions were contacted. At 2 p.m., the day before the scheduled closing he and Caniglia approached Clatterbuck and sought $350,000. There is no evidence that Young ever successfully assembled all the pieces, either on February 25, 1977, or within a reasonable time thereafter. On March 2, 1977, Overland Hills demanded forfeiture of his earnest money. ''A proposed purchaser is not able to perform when he is depending upon third parties to make the purchase, which funds such persons are in no way bound to furnish.'' 71 Am. Jur. 2d, Specific Performance, § 61, p. 89.

Having failed to tender the purchase price within the time due for performance under his contract, Young is not entitled to specific performance. He who asks a court of equity to specifically enforce what he claims are his rights under a contract must not himself be in default in his promises in the same contract. Clarke v. Koenig, 36 Neb. 572, 54 N. W. 842 (1893). ''A party who seeks specific performance

must show not only that he has a valid legally enforceable contract but also that he has substantially complied with its terms, by performing or offering to perform on his part the acts which formed the consideration of the undertaking on the part of defendant or that he is ready, able, and willing to perform his obligations under the contract * * *." Sofio v. Glissmann, 156 Neb. 610, 57 N. W. 2d 176 (1953).

We next turn to Tedco's purchase agreement. The Tedco agreement was negotiated by Pat Kelly on behalf of Overland Hills, and John Fullenkamp on behalf of Tedco. The purchase agreement is dated February 14, 1977, and was signed on behalf of Overland Hills by Donald Graham, corporate treasurer and a director, who is designated as "seller." The agreement is not notarized, nor is it under corporate seal. Kelly testified that he had the informal approval of 52½ percent of the outstanding shareholders of Overland Hills to enter into the agreement. There is evidence that 47½ percent of the outstanding shareholders of Overland Hills were not aware, as of February 14, 1977, of this agreement. Kelly testified that he informed Fullenkamp, prior to Graham's signing, that the treasurer was the best that he could do for a signature and that he was not sure of his authority in this regard. Kelly stated that Fullenkamp expressed disappointment upon being so informed. On April 6, 1977, Kelly drafted, and Graham signed, a letter to Tedco returning its $10,000 earnest money and stating that its contract was the only impediment to closing the Young contract. On April 11, 1977, Kelly informed Fullenkamp that Tedco's purchase agreement was invalid.

Where it is sought to enforce specific performance of a contract for the sale of realty executed for a corporation by its officers in their individual names, it must be shown either that the corporation authorized the contract or that the execution of the same

had been ratified by it. Parmele v. Heenan & Finlen, 75 Neb. 535, 106 N. W. 662 (1906).

Much discussion is devoted to the issue of whether or not Graham was authorized to enter into the agreement with Tedco. We find it unnecessary to discuss this issue because we conclude that in any event, regardless of Graham's authority, his actions in entering into the purchase agreement with Tedco were ratified.

All the relevant parties knew of the existence of the Tedco agreement by no later than February 25, 1977. Young's contract was scheduled to close that date, but did not. By March 2, 1977, Overland Hills apparently felt that the Young contract had terminated and demanded forfeiture of Young's earnest money which, under the terms of the Young agreement, it was entitled to if the purchaser was unable to tender the purchase price. Upon learning that the Young agreement had failed to close, Tedco demanded the closing of its agreement. Fullenkamp testified that Kelly kept putting him off, but never mentioned that the Tedco agreement was invalid nor would not close at this time. Tedco offered to purchase the same property as Young for $35,000 more than offered by Young. On April 6, 1977, Overland Hills apparently felt that the Young contract was again valid, and returned Tedco's earnest money, stating that its agreement was the sole impediment to closing Young's contract. On April 11, 1977, Fullenkamp was told that the Tedco agreement was invalid.

The record shows that as of February 14, 1977, Kenneth Stahl and Ray Lemke owned 40 percent of the stock of Overland Hills. By April 11, 1977, Stahl and Lemke owned 100 percent of the stock of Overland Hills, the vendor. Young testified that he was a real estate associate with Action Real Estate owned by Lemke and his wife. As shown earlier, Stahl and Lemke had "bought in" to the Young contract by

offering to put up a total of $240,000 on the purchase price of $450,000.

"A principal, after receiving information that an act has been done without actual or apparent authority by one purporting to act as his agent on his behalf, is not bound by that act under the law of agency unless he ratifies the act; but he may and must elect to repudiate or ratify such act promptly or at least within a reasonable time." 3 Am. Jur. 2d, Agency, § 178, p. 563.

It is argued that the time period involved, from February 25 until April 6, 1977, is too short to permit a ratification by silence or acquiescence and that to do so in this case would be unconscionable.

"Whether there has been a ratification in a particular case is ultimately and ordinarily a question of fact." 3 Am. Jur. 2d, Agency § 178, p. 564. " * * * the rule applicable generally is that where an act is done without authority, under an assumed agency, it is the duty of the principal to disavow and repudiate it in a reasonable time after information of the transaction if he would avoid responsibility therefor. What constitutes a reasonable time must largely, if not wholly, depend upon the circumstances of the particular case." 3 Am. Jur. 2d, Agency § 179, p. 565.

All the relevant parties knew of the existence of the Tedco agreement by no later than February 25, 1977. The corporation was made up of a small group of individuals and operated in an informal manner. We conclude that under the circumstances, defendant Overland Hills, by its silence and acquiescence, ratified the actions of Donald Graham in entering into the purchase agreement with Tedco.

Specific performance for Tedco will be decreed. Defendant Young's petition for specific performance is dismissed. The judgment of the District Court is affirmed.

AFFIRMED.